An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the *North Carolina Rules of Appellate Procedure*.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-700

Filed 15 July 2026

Rutherford County, No. 22CR051242-800

STATE OF NORTH CAROLINA

v.

MATTHEW LEONARD PATITO, Defendant.

Appeal by Defendant from judgment entered 31 October 2023 by Judge J. Thomas Davis in Rutherford County Superior Court. Heard in the Court of Appeals 23 April 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Scott K. Beaver, for the State.*

> *Attorney Gilda C. Rodriguez, for defendant-appellant.*

STADING, Judge.

This is a case about law enforcement's incremental development of reasonable suspicion. It also concerns the sufficiency of evidence to withstand a motion to dismiss. These matters are factually nuanced and present in shades of gray. After the trial court's denial of his motions, Matthew Leonard Patito ("Defendant") was found guilty by a jury and sentenced by the trial court for trafficking in methamphetamine, carrying a concealed weapon, and resisting a public officer.

Defendant entered his notice of appeal, contending the trial court committed error by denying his motions. For the reasons below, we reverse the trial court's ruling on Defendant's motion to suppress, vacate the judgment, and grant Defendant a new trial.

## I. Background

A grand jury delivered a true bill of indictment, charging Defendant with trafficking in methamphetamine, carrying a concealed weapon, and resisting a public officer. Before his trial, citing a Fourth Amendment violation, Defendant moved to suppress evidence. Specifically, Defendant argued his seizure was unlawful because "[i]f there were not original grounds for an investigatory stop, then [he] was free to leave, despite the Officers' desire for an encounter with him." He also argued "his initial detention [was] unlawful so any statements he [made] are fruit of the poisonous tree."

Evidence offered by the State at Defendant's suppression hearing tended to show that on 29 January 2022, around 2:30 a.m., Deputy Jonathan Clayton and several other deputies of the Rutherford County Sheriff's Office sought to serve an arrest warrant on Curtis Tipton. The record from the suppression motion hearing does not include further information about the arrest warrant. The deputies "had been out to 271 Phillips Drive on numerous occasions in search of Mr. Tipton," where they learned "from his parents that he was driving a silver-in-color Mercury van" and "hung out at 169 Phillips Drive." Deputy Clayton had never encountered Defendant

but was familiar with Mr. Tipton. Deputy Clayton and other uniformed deputies approached the property on foot, in the dark, with their flashlights turned off. They observed a silver Mercury van, believed to be Mr. Tipton's, and Defendant "[s]tanding in close proximity to the van." Defendant, who they thought was Mr. Tipton,[1] was the only person in the yard. The record from the suppression motion hearing does not contain information about Mr. Tipton's presence at or near the property.

When approximately fifty yards from Defendant, Deputy Clayton exclaimed, "hey," and Defendant "went around a different vehicle in the yard." Defendant began running and the deputies announced, "Sheriff's office, stop!" several times. Defendant ran away from the deputies through the back yard. The deputies turned on their flashlights and pursued Defendant. Despite the deputies' pursuit, Defendant continued running "through the woods, across the road into a different neighborhood[.]" During the pursuit, the deputies briefly lost sight of Defendant when "he went around a building." "As soon as [Defendant] went around that building, he appeared again, and at that moment he put his hands up and he submitted." The pursuit ended after roughly 200 yards when Defendant stopped and submitted to the deputies in an area illuminated by streetlights.

When Defendant submitted to the deputies, they "detained him." At this point, Deputy Clayton "realized obviously it wasn't Curtis Tipton[.]" As Deputy Clayton

---

[1] At the suppression motion hearing, Detective Clayton was asked "Who did you believe [Defendant] to be?" He responded, "I believed it to be Curtis Tipton."

approached Defendant, he stated, "[y]ou're not even the guy we're looking for." Deputy Charles Dobbins then asked Defendant if he had any weapons on him and Defendant replied he did not. Although the record from *the suppression motion hearing* is not clear, either a *Terry* frisk[2] or search of Defendant's person revealed a gun located in his "right jacket pocket." Defendant was placed under arrest for "[j]ust the resist charge. . . . for him running[.]"

The trial court denied Defendant's motion to suppress and found:

1. On January 29, 2022, around 2:23 a.m., four to six deputies in uniform with the Rutherford County Sheriff's Office were attempting to serve an outstanding warrant against a Mr. Curtis Tipton.

2. Mr. Curtis Tipton was known by the officers to frequent the property at 169 Phillips Drive in Forest City, which is the property or residence of the defendant in this case.

3. The officers parked at the end of the road at Phillips Drive, at a business, and started walking down the street toward the residence at 169 Phillips Drive in order to approach the dwelling without notice.

4. At the time the officers approached, it was dark, and the officers did not have their flashlights turned on at the time.

5. The officers recognized a silver van they believed to be driven by Mr. Curtis Tipton parked at 169 Phillips Drive.

6. As officers approached 169 Phillips Drive, they noticed a gentleman standing in the yard near the van; and when they approached closer, the individual who is the

---

[2] *See Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S. Ct. 1868, 1884–85 (1968).

defendant in this case started running. Prior to the defendant beginning to run, officers had attempted to speak with him by saying "hey."

7. The defendant ran some two hundred yards across the street in the neighborhood; and immediately upon him starting to run the officers announced who they were several times.

8. The officers directed the defendant to stop, which he did not do for a period of time; when the defendant started to run the officers did turn on their flashlights in order to track the defendant and follow him.

9. After running approximately 200 yards, the defendant did come to a stop and at the time he stopped, the officers approached him and recognized that he was not, in fact, Curtis Tipton, even though they had a good faith and reasonable belief that it was Mr. Tipton who was running from the scene where they believed him to be at the time.

10. As officers approached the defendant, they asked if he had any weapons. He responded no and at that time the officers placed him under arrest for resisting, obstructing, and delaying an officer as a result of his leaving and, upon a search pursuant to that arrest, did in fact find a weapon.

11. The findings of fact are based on the testimony of Deputy Jonathan Clayton, with the Rutherford County Sheriff's Office.

Based on these findings, the trial court concluded as a matter of law:

1. Based on a preponderance of the evidence and the totality of the circumstances, the officers had a reasonable suspicion to stop the defendant as a result of his running and after they had announced who they were and directed him to stop, he failed to do so.

2. As a result, the officers developed and had probable

cause to arrest the defendant when he was placed under arrest; and that he was lawfully under arrest at the time.

3. At the time that the Defendant was Mirandized, the defendant had been placed under lawful arrest, and at that time the Defendant freely and voluntarily[3] made statements which are the subject of the present motion.

4. The officers had a reasonable suspicion of criminal activity when they directed him to stop as a result of his running away from the officers as they approached, and had probable cause at the time of the arrest when they arrested him for resisting, obstructing, and delaying.

At Defendant's subsequent trial, similar evidence was introduced regarding Defendant's detention, but in greater detail. Notably, missing from *the suppression motion evidence*, but contained in *the trial transcript* was the prosecutor's direct examination of Deputy Dobbins that revealed when Defendant "stopped, he put his hands in the air, and he reached for his right pocket." Although the prosecutor neither asked Deputy Clayton about Defendant's movements when he was apprehended at the suppression motion nor called Deputy Dobbins to testify at the suppression motion, *at trial* Deputy Dobbins elaborated: "[Defendant] faced us, and he was reaching or grabbing at his right pocket, and then when he was instructed to get his hand out of his pocket, he put both hands up." Defendant did not object to the introduction of this testimony about the gun at trial.

---

[3] In the original order contained within the appellate record, there is a handwritten insertion of the words "freely and voluntarily" between "Defendant" and "made." This handwriting is accompanied by initials and date of "10-30-23." Neither party contests the validity of Defendant's statements, and we see this correction as a response to a clerical error and therefore ignore it.

Once detained, Deputy Clayton explained *at trial* that he approached Defendant, grabbed his arm to detain him, "and at that point [ ] realized he was not Curtis Tipton." *At trial*, Deputy Clayton clarified that upon realizing Defendant was not Curtis Tipton, he "patted him down." Deputy Clayton added, "[Defendant] was in possession of a firearm." And when asked why Defendant was detained, Deputy Clayton stated because of "[h]im running from us and having a firearm."

After detaining Defendant, the deputies retraced Defendant's pattern of travel "to see if there was anything thrown down" during the pursuit. Within the fifty-yard stretch where the deputies had lost sight of Defendant, Deputy Dobbins discovered a bag on the ground containing a crystal-like substance "believed to be methamphetamine." Deputy Dobbins added that the substance was seized after another deputy "walked his k-9 over and the k-9 alerted on the bag." Defendant thereafter objected to the testimony that this substance "was in fact meth," which was overruled by the trial court. Deputy Clayton explained the bag had three bags within it, all containing different amounts of the crystal-like substance. The North Carolina State Crime Lab tested the substances in two of the three bags. The test results confirmed that those two bags contained methamphetamine, with a "net weight of 53.44 grams plus or minus 0.08 grams." [4]

---

[4] All three bags were not tested because the possession offense would not have been elevated if the third bag had also tested positive. Thus, only two of the bags were tested and they both met the minimum requirement of weight to sustain a trafficking charge.

Once the substance was found, Deputy Clayton "put [Defendant] in the back of [his] vehicle" read Defendant his *Miranda* rights,[5] and asked Defendant about the substance in the bag. At trial, Defendant objected to the introduction of his statements to the deputies "based on [his] pretrial motion," which was overruled by the trial court. Defendant objected again when the State requested to admit body camera footage of these statements. In those statements, the record shows Defendant provided "information about where he got the substance, how much he paid for the substance, [and] who he got the substance from."

At the close of the State's evidence, Defendant moved to dismiss all charges, arguing there was insufficient evidence "as to each and every element of all three crimes." The trial court denied the motion. Defendant renewed his motion to dismiss at the close of all evidence; again, the trial court denied the motion. Upon deliberating, the jury found Defendant guilty on all charges. For his trafficking in methamphetamine conviction, the trial court sentenced Defendant to a minimum term of 70 months and maximum term of 93 months in the custody of the North Carolina Department of Adult Correction. And for his two misdemeanor convictions, the trial court sentenced Defendant to separate 60-day sentences. Defendant was given credit for pretrial confinement and ordered to pay a fine. The trial court ordered

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

the sentences to "run concurrent with each other[.]" Defendant entered his notice of appeal in open court.

## II. Analysis

Defendant argues the trial court committed error by denying his motion to suppress and motion to dismiss the charge of resisting a public officer.

### A. Motion to Suppress

Defendant first contends the trial court committed error by denying his motion to suppress. He posits this error resulted because "he was unlawfully placed into custody" and thus the subsequent admission of statements and other evidence were "fruits of the poisonous tree."

We review the trial court's suppression order to determine whether the findings of fact are supported by competent evidence and whether those findings support its conclusion of law. *See State v. Alvarez*, 385 N.C. 431, 433, 894 S.E.2d 737, 738 (2023). A "trial court's findings of fact 'are conclusive on appeal if supported by competent evidence . . . .'" *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (citations omitted). When "no exceptions are taken to findings of fact, 'such findings are presumed to be supported by competent evidence and are binding on appeal.'" *State v. Baker*, 312 N.C. 34, 37, 320 S.E.2d 670, 673 (1984) (citing *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000)). The conclusions of law are reviewed de novo and are therefore subject to full review. *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011). " 'Under a de novo review, the court considers

the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

Defendant does not challenge the trial court's findings of fact; he contests the trial court's legal conclusions of law that he had been validly detained and arrested. The trial court's unchallenged factual findings are thus binding on appeal. *See Baker*, 312 N.C. at 37, 320 S.E.2d at 673. Accordingly, we proceed by reviewing the challenged conclusions of law de novo. *See Biber*, 365 N.C. at 168, 712 S.E.2d at 878.

### 1. *Reasonable Suspicion*

Defendant asserts the deputies "had no right to stop [Defendant] in his backyard, [Defendant] did not willfully resist, delay, or obstruct . . . and, therefore, contrary to trial court's conclusions of law, probable cause was not established." Citing *State v. White*, Defendant argues that his flight was from "a consensual encounter" or "an unlawful investigatory stop lacking reasonable suspicion." 214 N.C. App 471, 712 S.E.2d 921 (2011). However, a careful look at the circumstances of the present matter compared to those of *White* reveals that Defendant's urged position ignores significant factual distinctions and oversimplifies the concepts underlying reasonable suspicion.

"Both the United States and North Carolina Constitutions protect against unreasonable searches and seizures." *State v. Otto*, 366 N.C. 134, 136, 726 S.E.2d

824, 827 (2012); U.S. Const. amend. IV; N.C. Const. Art. I, § 20. A person is "seized" under the Fourth Amendment when, "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 1877 (1980). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547 (1991)). A show of authority can restrain a person's freedom of movement " 'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *State v. Isenhour*, 194 N.C. App. 539, 543, 670 S.E.2d 264, 267 (2008) (quoting *Mendenhall*, 446 U.S. at 553, 100 S. Ct. At 1877).

The "Fourth Amendment permits a police officer to conduct a brief investigatory stop of an individual based on reasonable suspicion that the individual is engaged in criminal activity." *State v. Jackson*, 368 N.C. 75, 77, 772 S.E.2d 847, 849 (2015); *see also Terry*, 392 U.S. at 30–31, 88 S. Ct. at 1884–85. "An officer has reasonable suspicion if a 'reasonable, cautious officer, guided by his experience and training,' would believe that criminal activity is afoot 'based on specific and articulable facts, as well as the rational inferences from those facts.' " *State v. Williams*, 366 N.C. 110, 116, 726 S.E.2d 161, 167 (2012) (quoting *State v. Watkins*,

337 N.C. 437, 441–42, 446 S.E.2d 67, 70 (1994)); *see also State v. Bullock*, 370 N.C. 256, 259, 805 S.E.2d 671, 674 (2017). "[R]easonable suspicion requires specific, articulable facts indicating present, ongoing criminal activity and will not allow a stop based on a mere inchoate suspicion or 'hunch.'" *Jackson*, 368 N.C. at 77–78, 772 S.E.2d at 849 (citations omitted). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 676 (2000). "[R]easonable suspicion is an 'abstract' concept that cannot be reduced to 'a neat set of legal rules[.]'" *Kansas v. Glover*, 589 U.S. 376, 384, 140 S. Ct. 1183, 1190 (2020) (quoting *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002)).

"The reasonable suspicion necessary to justify such a stop is dependent upon both the content of information possessed by [the officer] and its degree of reliability. This standard considers the totality of the circumstances—the whole picture." *Jackson*, 368 N.C. at 78, 772 S.E.2d at 849 (brackets in original). "[W]here police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and [bringing] offenders to justice." *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 680 (1985). And when a suspect flees, although his flight is not necessarily indicative of wrongdoing, it certainly is suggestive of wrongdoing. *See Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676. In essence, flight coupled with other circumstances

that provide a minimal amount of reasonable suspicion is sufficient. *See id.* at 125–26, 120 S. Ct. at 676; *see also State v. Butler*, 331 N.C. 227, 233–34, 415 S.E.2d 719, 722–23 (1992). And in any event, detention under this framework may last no longer than is necessary to effectuate the purpose of the stop. *State v. McNeil*, 262 N.C. App. 497, 502, 822 S.E.2d 317, 322 (2018) (citing *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 1615 (2015)).

Defendant maintains his encounter with law enforcement was "consensual" and the "officers did not have reasonable suspicion to conduct an investigatory stop." As such, Defendant argues he was "free to ignore the encounter" with the deputies under *White*, 214 N.C. App. at 476, 712 S.E.2d at 925. In *White*, the State's evidence at the defendant's suppression motion hearing tended to show that law enforcement was dispatched due to "loud music" in a "high-crime area" at an intersection of two streets. *Id.* at 472–73, 712 S.E.2d at 923–24. "[T]he report did not identify the apartment complex or a specific apartment within it as the source of the music complaint, nor did it identify the person who made the complaint." *Id.* at 472, 712 S.E.2d at 923. Additionally, since the streets intersected at two points, the report failed to specify which intersection. *Id.* Upon responding to the complaint, the testifying detective "did not hear any music, and did not see any noise-producing device," but observed the defendant "standing near a dumpster." *Id.* The responding officers then stopped their vehicle approximately thirty-five feet away from the defendant. *Id.* At the time, the officers "were dressed in cargo pants and blue polo

shirts with 'Police' written in black letters on the back and an embroidered badge on the front left chest." *Id.* The officers were in unmarked patrol vehicles "with no labels, decals, or exterior lights." *Id.* Upon exiting the patrol vehicle, one of the officers shouted "Stop! Police." *Id.* Either before or after the officer's announcement, the defendant ran, and the officers pursued the defendant on foot.[6] *Id.* "After running approximately [150] yards, [the] [d]efendant tripped and fell to the ground." *Id.* At that moment, one of the officers jumped on the defendant and handcuffed him. *Id.* at 472–73, 712 S.E.2d at 923–24. In doing so, a small bag of crack cocaine fell out of the defendant's pocket. *Id.* at 473, 712 S.E.2d at 924. The officers arrested the defendant for possession with intent to sell and deliver cocaine, possession of cocaine, and resisting, delaying, and obstructing a public officer. *Id.*

At the conclusion of the defendant's suppression motion trial, the trial court concluded the police had a reasonable suspicion to believe criminal activity was afoot and denied the motion. *Id.* at 473–74, 712 S.E.2d at 924. The trial court also determined the police had "probable cause to charge [the defendant] with resisting, delaying, or obstructing a public officer." *Id.* at 474, 712 S.E.2d at 924. The defendant

---

[6] It is unclear from the facts of *White* whether the police announced their presence or the defendant fled first. The analysis indicates as much given that the Court held, "the State has failed to establish a nexus between [the] [d]efendant's flight and the police officers' presence. The State has provided no evidence that [the] [d]efendant's flight was in response to the officer's presence." *Id.* at 480, 712 S.E.2d at 928. The Court reasoned, "[t]here was no testimony to indicate whether [the] [d]efendant knew the police were present before he began running." *Id.*

filed his notice of intent to appeal the denial of the suppression motion and entered an *Alford* plea. *Id.*

On appeal, the defendant argued the trial court erred in denying his motion to suppress because the officers lacked reasonable suspicion to conduct an investigatory stop. *Id.* at 475, 712 S.E.2d at 925. Our Court noted the defendant was not seized until the detective used physical force and "fell on top of him." *Id.* at 479, 712 S.E.2d at 927. It reiterated the principle that an investigatory stop "may only be justified by 'a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.' " *Id.* at 476, 712 S.E.2d at 926 (quoting *Watkins*, 337 N.C. at 441, 446 S.E.2d at 70). But in *White*, the detective's testimony clarified that he needed probable cause to detain the defendant since he acted "to arrest him for resisting, delaying, or obstructing, a public officer." *Id.* at 477, 712 S.E.2d at 926. In any event, the Court decided neither standard was met. *Id.* at 479, 712 S.E.2d at 927.

The *White* Court relied on similarities between its case and that of *State v. Sinclair*, 191 N.C. App. 485, 663 S.E.2d 866 (2008), and *State v. Joe*, 213 N.C 148, 711 S.E.2d 842 (2011), *rev'd in part and remanded on other grounds*, 365 N.C. 538, 723 S.E.2d 339 (2012). *Sinclair* involved a report of "drug activity" at a bowling alley which was "a known drug activity area." 191 N.C. App. at 486–87, 663 S.E.2d at 869. Without particularized suspicion, a police officer exited an unmarked car, wearing "khaki pants and a polo shirt with an embroidered police badge" and approached the defendant, stating "let me talk to you." *Id.* The defendant ran off but was

apprehended and charged with resisting a public officer. *Id.* at 487, 663 S.E.2d at 869. This Court ruled these facts were insufficient to give the officer "a reasonable, articulable suspicion that [the defendant] was involved in criminal activity," and therefore also insufficient evidence that the officer "was discharging or attempting to discharge a lawful duty of his office." *Id.* at 491, 663 S.E.2d at 871.

In *State v. Joe*, an officer wearing both his duty belt and a black t-shirt with the word "Police" in yellow letters, observed the defendant from his unmarked van with "big eyes when [the defendant] [saw] the van." 213 N.C. App. at 150, 711 S.E.2d at 844. The officer got out of the van and the defendant ran away; he then yelled " 'police' several times in a loud voice." *Id.* After chasing the defendant "for about two or three city blocks," the officer "grabbed" the defendant's arm and "placed him under arrest for resisting a public officer." *Id.* Accounting for all the "circumstances surrounding the encounter prior to [the defendant's] flight," this Court concluded "a reasonable person would have felt at liberty ignore [the officer] and go about his business." *Id.* at 156, 711 S.E.2d at 847. In sum, the Court determined the officer neither had reasonable suspicion to conduct an investigatory stop nor probable cause to arrest the defendant for "resisting, delaying, or obstructing [the officer] in the performance of his duties." *Id.* Thus, the common thread in *White*, *Sinclair*, and *Joe* —but not in this case—is that law enforcement did not formulate reasonable suspicion of criminal activity before detaining the defendants. Here, the evidence in

the motion to suppress hearing tends to show that deputies initially had reasonable suspicion Defendant was the subject of the arrest warrant.

Contrary to Defendant's argument, when considering the circumstances of this case through the lens of a reasonable suspicion analysis, another case is more instructive. In *State v. Lynch*, this Court was tasked with determining whether the defendant's detention was illegal when an officer "mistakenly believed that [the] defendant was another individual for whom arrest warrants had been issued." 94 N.C. App. 330, 332–33, 380 S.E.2d 397, 398–99 (1989). This Court did not delve into whether the mistake justified the defendant's arrest because "it was at least sufficient to establish a reasonable basis to stop [the] defendant and require him to identify himself." *Id.* (citing *United States v. Glover*, 233 U.S. App. D.C. 161, 725 F.2d 120 (1984), *cert. denied*, 466 U.S. 905, 104 S. Ct. 1682 (1984)). The *Lynch* Court thus held "defendant fled from a lawful investigatory stop." *Id.* at 334, 380 S.E.2d at 399 (citing *State v. McNeill*, 54 N.C. App. 454, 456, 283 S.E. 2d 565, 567 (1981)). Though, this Court noted, under the specific facts of *Lynch*, it needed not address whether mere flight after an attempted investigatory stop—in and of itself—was sufficient for "probable cause to arrest an individual for violation of G.S. 14-223"[7] since the defendant "continued to struggle after the officers apprehended him." *Lynch*, 394 N.C. App. at 334, 380 S.E.2d at 399.

---

[7] This statute addresses unlawfully resisting, delaying or obstructing a public officer in discharging or attempting to discharge an official duty.

Here, as in *Lynch*, and unlike *White*, *Sinclair*, and *Joe*, the deputies were attempting to serve an outstanding arrest warrant, and they *reasonably believed* Defendant to be the subject of the warrant. An arrest warrant is issued by a judicial official "upon a showing of probable cause supported by oath or affirmation." N.C. Gen. Stat. § 15A-304 (2025). There is more than a suspicion of criminal activity when an arrest warrant is issued. To serve an arrest warrant, a police officer must ascertain the identity of the arrestee. Here, the deputies were informed by Curtis Tipton's parents that he "was driving a silver-in-color Mercury van" and "hung out at 169 Phillips Drive." When attempting to serve the arrest warrant, Defendant was outside the residence at 169 Phillips Drive, in the dark, and "in close proximity" to the "silver-in-color Mercury van." Deputy Clayton testified in the motion to suppress hearing that he "believed it was Curtis Tipton." And as observed by the *Lynch* Court, if law enforcement was unable to conduct an investigatory stop when a suspect—reasonably believed to be the subject of an arrest warrant—flees upon approach, they would be precluded from identifying and serving an arrest warrant supported by probable cause. 94 N.C. App. at 333, 380 S.E.2d at 399 ("Because defendant had not identified himself, the officers had no choice but to apprehend him in order to ascertain his identity."); *see also United States v. Glover*, 233 U.S. App. D.C. at 163, 725 F.2d at 122 ("The arrest of a person who is mistakenly thought to be someone else is valid if the arresting officer (a) has probable cause to arrest the person sought, and (b) reasonably believed the person arrested was the person sought."). In the

present matter, our Fourth Amendment jurisprudence supports the conclusion that the deputies had sufficient reasonable suspicion in their pursuit and initial detention of Defendant.

Unlike *Lynch*, however, here the motion to suppress hearing does not contain evidence that Defendant continued to struggle after the deputies apprehended him. 394 N.C. App. at 334, 380 S.E.2d at 399. In fact, the undisputed evidence was that upon Defendant's detention, Deputy Clayton approached Defendant and "realized obviously [Defendant] wasn't Curtis Tipton." We therefore believe it prudent to discern whether the scope of the detention was lawful. *See United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). "The scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983).

In this case, the underlying justification for Defendant's detention was service of an arrest warrant for Curtis Tipton. And, as we held above, the deputies had sufficient reasonable suspicion in their pursuit and initial detention of Defendant; however, Deputy Clayton's revelation that "[y]ou're not even the guy we're looking for" dispelled the suspicion that Defendant was Curtis Tipton. We note additional

evidence could have supplied independent reasonable suspicion for Defendant's continued detention. However, evidence presented at the suppression motion hearing did not show "reasonable suspicion of another crime arose before that mission was completed." *Bullock*, 370 N.C. at 258, 805 S.E.2d at 673 (citing *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 1615 (2015)). For example, evidence was not presented at the suppression motion hearing that Defendant obstructed or delayed the deputies' attempted service of the warrant on Curtis Tipton. We also note, at the suppression motion hearing, there was neither evidence about the nature of the crime listed on the arrest warrant nor the character of area from where Defendant fled. Moreover, there was not evidence presented at *the suppression motion* hearing that "[Defendant] faced us, and he was reaching or grabbing at his right pocket, and then when he was instructed to get his hand out of his pocket, he put both hands up." Accordingly, upon confirming Defendant was not Curtis Tipton, reasonable suspicion dissipated.

### 2. *Fruits of the Poisonous Tree*

Having determined the point when reasonable suspicion dissipated, we must now consider the admissibility of evidence at Defendant's new trial. Generally, when the State obtains evidence in violation of the federal constitution, the remedy is its exclusion from trial. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961) ("We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court."). This rule of

exclusion applies to both unconstitutionally obtained "verbal evidence" and "tangible fruits." *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963). Additionally, North Carolina codified the exclusionary rule. *See* N.C. Gen. Stat. 15A-974 (2025); *see also State v. Rogers*, 388 N.C. 453, 476, 920 S.E.2d 775, 782 (2025) ("[T]his Court specifically observed that "[t]he federal exclusionary rule . . . became statutory law in North Carolina long before *Mapp* by enactment.").

With respect to admission of the firearm evidence, we must assess whether the trial court plainly erred because Defendant did not object at trial. *See State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198–99 (2000) (citation modified) ("As a pretrial motion to suppress is a type of motion in limine, [the defendant's] pretrial motion to suppress is not sufficient to preserve for appeal the question of the admissibility of his statement because he did not object at the time the statement was offered into evidence. In addition, while [the defendant's] assignment of error includes plain error as an alternative, his brief contains no specific argument that there is plain error in the instant case."). Here, Defendant "specifically and distinctly argues on appeal that the trial court committed plain error." Our Supreme Court has recently reiterated standard for plain error, explaining "the plain error standard requires a determination that the jury *probably would have* returned a different result." *State v. Reber*, 386 N.C. 153, 160, 900 S.E.2d 781, 787 (2024) (citation omitted). Even with this high bar, in this particular instance, we hold it was plain error for the trial court to admit evidence of the firearm at trial. We also hold it was

error for the trial court to admit evidence of Defendant's statements that came after reasonable suspicion dissipated.[8] As a result of the plain error in admitting the firearm evidence and error committed in overruling Defendant's objection to evidence of his statements obtained after reasonable suspicion dissipated, he is entitled to a new trial. *See State v. Campbell*, 14 N.C. 493, 497, 188 S.E.2d 560, 562 (1972).

Although it was not raised at the motion to suppress hearing, we note the admission of the methamphetamine evidence would be a different story as its discovery was not the product of an unlawful detention and thus was not a fruit of the poisonous tree. Our courts have long held that people have no reasonable expectation of privacy in abandoned property. *See, e.g., Hester v. United States*, 265 U.S. 57, 58, 44 S. Ct. 445, 446 (1924) ("The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned."); *see also State v. Borders*, 236 N.C. App. 149, 762 S.E.2d 490 (2014). Trial testimony tends to show the methamphetamine was located on the ground when retracing Defendant's steps where they "had lost sight of him."[9] Accordingly, the

---

[8] Though Deputy Clayton had read Defendant his *Miranda* rights, the evidence at trial shows the taint of Defendant's admissions was not removed by his voluntary confession. *See State v. Allen*, 332 N.C. 123, 128, 418 S.E.2d 225, 228 (1992) ("[I]f a person is illegally arrested, any inculpatory statement he makes while under arrest must be suppressed unless the State can show the causal chain was broken by some independent circumstance which will show the statement was not caused by the arrest.").

[9] The evidence tends to show the abandoned methamphetamine was not located on Defendant's real property nor its curtilage.

methamphetamine evidence is admissible at Defendant's new trial so long as its admission otherwise complies with this opinion and the rules of evidence.

## B. Motion to Dismiss

Since we conclude the trial court erred in denying Defendant's motion to suppress, we need not address his argument that the trial court erred in denying his motion to dismiss the charge of resisting, delaying or obstructing a public officer.

## III. Conclusion

For the above reasons, we reverse the order denying Defendant's motion to suppress, vacate the judgment, and grant Defendant a new trial.

NEW TRIAL.

Chief Judge DILLON and Judge WOOD concur.

Report per Rule 30(e).